Filed 7/31/26  P. v. Begay CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>DYLIN PAUL BEGAY,<br><br>        Defendant and Appellant. | A171869<br><br>(Sonoma County<br> Super. Ct. No. 23CR02548) |

Dylin Paul Begay was convicted of theft from an elder after a jury trial. He contends the trial court erred in admitting statements he maintains were rendered involuntary by improper police questioning and obtained in violation of *Miranda*.[1]  He further contends the trial court abused its discretion with respect to several evidentiary rulings.  We affirm.

## BACKGROUND

### I.

### *Factual Background*

In late June and early July 2023, Begay made four withdrawals at an ATM in Guerneville from the bank account of Gregory Hallett.  Begay, who had been a caregiver for Hallett, maintained he made the withdrawals at the request of Trudy Millerstrom, Hallett's longtime friend and caregiver.

---

[1]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Millerstrom denied asking Begay to withdraw the money, and Hallett did not authorize the withdrawals.

**A. Prosecution Case**

At the trial in September 2024, Hallett testified that he was 78 years old and had been living in a care facility for 16 months. He testified that Begay was his closest friend; Hallett "thought he was my brother." Trudy Millerstrom was Hallett's "partner in life"; they had been together on and off for 45 years. Begay helped take care of Hallett, taking over duties like helping Hallett shower and dress that were normally done by Millerstrom.

Hallett testified that Millerstrom helped him manage his bank account at Bank of America. He had put her on the account and they both had access to it. Hallett testified, "her money was my money and my money was her money."

Begay also had access to Hallett's bank account because Hallett had often given him the PIN so he could get money for Hallett when Hallett was too sick to go to the ATM. Hallett never gave Begay permission to take $1,000 or $800 out of his account; Begay never gave Hallett sums of $1,000 and $800 withdrawn from the account; and Hallett never gave Begay permission to keep money from the account for himself.

After Hallett was informed by the bank that sums of $1,000 and $800 had been withdrawn from his account in June and July 2023, he spoke with Sheriff's Deputy Bryan Jensen. A recording of their October 26, 2023 phone call was played at trial. Hallett told Jensen he knew he was owed "a ton" of money, but he was not sure whether he had been told about "at least four transactions between June and July" because he had Alzheimer's and his memory was "just shot." Hallett did not recall giving Begay his PIN but said, "I might have. I might have because I was pretty sick then [¶] . . . [¶] . . . And

2

I might not have been able to get to the automatic teller." He did not give Begay permission to take sums of $1,000, $83, $800 and $403 from the account.

Trudy Millerstrom testified that she was 78 years old and had known Hallett for 50 years; they had lived together 30 or 40 years ago; and they were "really good friends." She started taking care of Hallett when he got sick, some 15 or 20 years ago, and about 12 years ago she became his paid, full-time IHSS (In Home Supportive Services) caregiver.

Millerstrom met Begay about five years before trial. He and his boyfriend, David Gibson, needed a place to live and Millerstrom invited them to stay with her in exchange for gardening assistance. Begay became an additional caregiver for Hallett because Millerstrom was overworked and exhausted, and the two men became good friends.

Millerstrom helped Hallett with finances: He gave her access to his bank account to set up automatic payment for his bills and she kept track of his passwords. He was almost always present when she accessed his account. Millerstrom became a joint owner of the account in April 2024; prior to that, she was an "ITF" on the account, which she said meant the bank could give her information but she "couldn't do much." Millerstrom explained that she wanted the additional control over the account so she would be able to handle Hallett's affairs if he died.

Millerstrom and Begay stopped caring for Hallett in April 2023, when he was hospitalized and then went to the care facility. At some point after Hallett was hospitalized, Bank of America notified Millerstrom there had been potentially suspicious transactions on Hallett's account. Millerstrom saw withdrawals of $1,000 and then $800 on the bank statement. Hallett could not have made the withdrawals because he was in the hospital in Santa

3

Rosa. Millerstrom had Hallett's ATM card but did not withdraw the money or give anyone else permission to do so.[2] Hallett had never lost his ATM card. To the best of Millerstrom's recollection, "this kind of money" had never been taken out of Hallett's account. She said, "[t]here was no need for big amounts of cash" because Hallett "didn't have anything to spend it on."

Millerstrom called the bank and was told Hallett had to file a police report before the money could be reimbursed. The bank told her they had photographs of the person who withdrew the money and sent her copies. Millerstrom recognized the person in the photographs as Begay. She never gave Begay permission to take $1,000 and $800 from Hallett's account or told him to do so.

Millerstrom went to file a police report and spoke with Deputy Sheriff Jensen. She told him that she recognized Begay in the photographs and that Hallett had not withdrawn the money. On cross examination, Millerstrom testified that she did not recall telling Jensen she was in charge of Hallett's finances and did not recall whether she told him she had full access to and use of the bank account. She testified that reviewing Jensen's report would not refresh her memory about what she told him but that "whatever is on that report, I'm sure I told him."

On direct examination, Millerstrom was asked whether her relationship with Begay started to deteriorate at some point and responded, "We had our ups and downs, but I wouldn't say it was deteriorating." On cross examination, defense counsel asked if Millerstrom recalled having an

---

[2] Millerstrom testified that she put a stop on the card because of the unauthorized withdrawals and ordered a new one for Hallett, but she never saw the new card and to her knowledge Hallett did not see it.

argument with Begay around September 2023. She testified, "Probably. He has a pretty foul mouth, and I was tired of being called a bitch and a whore and a slut and a few other names. So I looked at him, and I said, no more, no more, you're done." Defense counsel asked, "So you didn't appreciate that?" and Millerstrom testified, "I did not appreciate a lot of what the man did." Begay was still living on Millerstrom's property at the time of trial.

Deputy Jensen testified that he spoke with Millerstrom when she initially came to the station on October 26, 2023, then subsequently on November 17 and November 29. He did not record any of these conversations on his body worn camera.

Jensen testified that when he received the bank photographs from Millerstrom, he located a photograph of Begay in the sheriff's system and matched it with the ones from the bank. He got Hallett's bank statements from Millerstrom and saw the four transactions that were noted as fraudulent, which were executed on June 27 and July 3, 2023. These dates matched the date stamps on photographs of Begay at the Guerneville Bank of America ATM. Jensen spoke with Hallett, who said he had not given Begay permission to withdraw money from the account.

On November 17, 2023, Jensen went to Begay's residence to interview him. Jensen was wearing a body camera and the recording of his interaction with Begay was played at trial. As will be detailed further, Begay insisted he was not the person in the ATM photographs and denied making the June and July withdrawals at issue. As Jensen continued to tell Begay it was him in the photographs, Begay, crying, said "I'm sorry" several times and said, "My li[f]e is fucked." Jensen testified that when he saw Begay, he was "100 percent" sure Begay was the person in the ATM photos, and Begay's denial did not change Jensen's opinion.

5

**B. Defense Case**

Begay testified that he and his partner, David Gibson, lived in a shed on Millerstrom's property that did not have water or power. Begay was officially hired by IHSS as Hallett's caregiver in 2022. He cooked and cleaned for Hallett and assisted him with medications, doctors appointments and shopping. Begay sometimes took Hallett to the bank and helped him withdraw money from his account when Hallett asked him to do so. He always gave the money to Hallett. Begay once borrowed $100 from Hallett and repaid it the next day.

Begay testified that he made the withdrawals in late June and early July 2023 at Millerstrom's request. She told him she was going to visit Hallett soon and he needed the cash, and she gave Begay the ATM card. After making the withdrawals, Begay gave the money, ATM card and receipt to Millerstrom.

Regarding his statements to Jensen, Begay acknowledged that he said he was not the person in the photographs, did not make the withdrawals and did not say Millerstrom had asked him to take out the money. Begay testified he was overwhelmed with the situation and scared of what would happen to him. He suggested Jensen did not give him a chance to explain himself, then said, "at that time he wouldn't have believed me anyways."

## II.

### *Procedural Background*

A first amended information filed on August 16, 2024, charged Begay with theft from an elder or dependent adult by a caretaker. (Pen. Code, § 368, subd. (e).) A jury found him guilty on September 9, 2024.

On November 6, 2024, the court suspended imposition of sentence and placed Begay on probation for two years, with conditions including a 180-day

6

jail term, 30 days to be served in custody and 150 days on work release. He was ordered to pay restitution of $2,305 to Hallett and a restitution fine of $300. Begay filed his notice of appeal the same day.

# DISCUSSION

## I.

### *Admissibility of Begay's Statement*

Begay contends his statements to Jensen should have been excluded because they were rendered involuntary by the officer's implied promises and threats and obtained in violation of *Miranda*.[3] " 'In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.' (*People v. Duff* (2014) 58 Cal.4th 527, 551.) We review issues concerning the suppression of such statements under federal constitutional standards. (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)" (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

## A. Additional Background

The People moved in limine to admit the recording of Begay's November 17, 2023 statements to Jensen. Jensen testified that he first spoke

---

[3] Anticipating the People arguing he forfeited his voluntariness challenge, Begay argues the challenge was preserved and, if we disagree, he received ineffective assistance of counsel. The People do not argue forfeiture and we need not address these issues.

with Begay at the door of his residence and asked Begay to come to the street and talk with him. Begay put his shoes on and they walked toward the patrol vehicle. Begay was not handcuffed as they walked or while they talked, until he was arrested.

As seen in the recording and transcript, Jensen told Begay he was there about Hallett and Begay confirmed that he used to take care of Hallett, knew he was presently in a care facility and thought Hallett was "in his eighties." Jensen said the issue was "some cash withdrawals in July." He told Begay to "[c]ome to the front of my car so I can show you some stuff" and said, "obviously I'm kind of aware of some misgivings of some money. So, if you wanna be like . . . upfront with me about what's goin' on, mistakes that were made, that's cool." Jensen said he was specifically looking at transactions in late June and July. Begay responded, "I didn't do anything about those transactions. . . . Millerstrom] didn't even come to me and talk to me about anything about it. She just, she just went, she didn't even show me any of the tapes. She didn't show me any of the pictures that she got. . . . I took care of him so I had access to his bank account. But that was early, earlier in the year . . . ."

At this point, Jensen said, "So Dyl I'm gonna . . . stop you right there. I have transactions of you removing a thousand dollars, eight hundred dollars. Can I show you somethin'?" After Begay said yes, Jensen continued, "You good? . . . Obviously I'm writing a report. 'Kay? And whatever you tell me, you know, I'll put onto there. If you want to admit to your misgivings, I will totally put that you're, you, you're sorry for what you've done." Begay asked if Jensen was there to arrest him and Jensen replied, "I don't know yet" and, showing him a picture, "Who's that? That's you." Begay said he did not withdraw money from Hallett's account and Jensen asked again, "Who's

8

that? [¶] . . . [¶] . . . Dylin, Dylin, Dylin.  Are you saying it's not you?"  Begay said it was not him.

Jensen told Begay to turn around and started to handcuff him.  After a brief exchange in which Jensen told Begay not to resist and Begay said he was not resisting, Begay said, "Oh God" and Jensen said, "Dylin, I was tryin' to be cool with you to try to give you—Dude, that is you.  Trust me, it's you.  Okay?"  Begay said, "Now I'm fucked" and Jensen said, "I get it, you're in a panic mode."  Begay said he was not and Jensen told him he was, then said, "I want you to hear me out.  'Kay?  I got . . . you on video making heavy withdrawals while he's in the hospital."  Begay said, "I didn't do it.  [¶] . . . [¶] . . . I don't know who you saw, but it was not me."

Jensen repeated, "That is you.  Dylin, that's you.  I know you don't want it to be you.  Y– but it's you."  Begay looked as though he was trying not to cry.  Jensen said, "Um, so here's what's gonna happen.  You have a warrant for your arrest as well, you have a, a drug warrant.  So you're gonna go to jail for that.  You're goin' to jail for elder abuse and theft.  So, here's what I need you to understand. [¶] . . . [¶] . . . If you want to reach out to me and make amends, I'm totally willing to it.  You know where I work, I work at the Guerneville substation, okay."  Begay was starting to cry.  Jensen continued, "I'm not gonna ask you anything right now.  Okay? [¶] . . . [¶] . . . The big thing about this is people make mistakes.  'Specially if they have drug habits, I get it.  I was tryin' to get you a chance to like make amends for what had happened and see if we find a way to resolve this.  'Cause [Hallett's] out money."  Crying, Begay said, "I'm sorry" and Jensen repeated that Hallett was out money.  As Jensen asked if there was anything in his pockets, Begay continued to say, "Oh my God. . . . Oh God.  I'm sorry.  I'm sorry."  Jensen told him, "[i]t's alright" and Begay repeated, "It's not okay.

9

My [life] is fucked." He continued to cry. Jensen told him, "It's California, dude, they're not gonna screw you."

At the hearing, the People stipulated to redacting two references to drugs in the recording but otherwise argued the recording was admissible because the situation was noncustodial and Begay's "I'm sorry" comments were spontaneous, not responses to direct interrogation.

The court found the recording admissible, with the stipulated redactions, subject to Evidence Code[4] section 352. The court found Begay was not in custody during the first portion of the conversation, noting he was not in handcuffs and not patted down; the interview was in his driveway; although two officers were present, one was "very much in the background"; Jensen's demeanor was "casual and nonconfrontational" until he showed Begay the ATM photo; there were no overt restrictions on Begay's movements until he was formally arrested; and the officers "did not dominate or control the questioning," "were not aggressive or confrontational or accusatory" and "did not pressure the defendant."

With respect to the portion of the interview after Begay was handcuffed, advised he was under arrest and clearly in custody, the court found the situation did not amount to interrogation. The court found the questioning was "actually not questioning, but mere advisements," explaining, "[t]he nature of the questions actually are not questions at all. In fact, the officer is telling Mr. Begay to stop talking and advising Mr. Begay that he is not asking questions at this time, meaning the officer was not intending to question Mr. Begay." Acknowledging that Jensen confronted

---

[4] Further statutory references will be to the Evidence Code unless otherwise specified.

10

Begay by saying it was him in the photographs, the court found this "advisement" similar to that in *People v. Haley* (2004) 34 Cal.4th 283 (*Haley*), in which a murder suspect was advised that his prints were found at the crime scene. Finally, the court found Begay's expressions of apology while being pat searched were not in response to questions or "anything directed by the deputy."

### B. *Begay's Statement Was Not Rendered Involuntary by Threats or Promises.*

#### 1. Governing Principles

"The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence." (*People v. Dykes* (2009) 46 Cal.4th 731, 753 (*Dykes*).) "To determine the voluntariness of a confession, courts examine ' "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' (*Dickerson v. United States* (2000) 530 U.S. 428, 434.) In making this determination, courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant. (*People v. Haley* (2004) 34 Cal.4th 283, 298; *People v. Massie* (1999) 19 Cal.4th 550, 576.) With respect to the interrogation, among the factors to be considered are ' " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity . . . .' " ' (*People v. Massie, supra,* 19 Cal.4th at p. 576.) With respect to the defendant, the relevant factors are ' " 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " ' (*Ibid.*)" (*Id.* at p. 752.)

" 'A statement is involuntary [citation] when, among other circumstances, it "was ' "extracted by any sort of threats . . . , [or] obtained by any direct or implied promises . . . ." ' " ' (*People v. Neal* [(2003)] 31 Cal.4th [63,] 79.)" (*Dykes, supra,* 46 Cal.4th at p. 752.) " ' "[M]ere advice or

11

exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." ' (*People v. Howard* (1988) 44 Cal.3d 375, 398; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409.)" (*People v. Carrington* (2009) 47 Cal.4th 145, 174.) " ' "In terms of assessing inducements assertedly offered to a suspect, ' "[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made.' " ' (*People v. Tully* (2012) 54 Cal.4th 952, 993 (*Tully*).)" (*People v. Stayner* (2026) 19 Cal.5th 395, 438.)

### 2. Analysis

Begay contends Jensen threatened him by saying that he would go to jail if he did not confess but, if he cooperated and made amends, Jensen would "see if we can find a way to resolve this." In Begay's view, Jensen's statements implied he had the power to resolve the case without prosecution or jail time but would send Begay to jail if he did not confess. He further contends Jensen took advantage of his distraught state of mind by continuing to urge him to confess despite recognizing that Begay was in "panic mode" and crying.

Having reviewed the recording from Jensen's body camera, we cannot agree with his characterization. Jensen did not suggest Begay could avoid going to jail if he confessed or made any other specific threat or promise of lenience to Begay; he told Begay that if he admitted wrongdoing, Jensen would put in his report that Begay was sorry for what he had done. In saying he had been trying to see if they could find a way to "resolve this," Jensen stated, " 'Cause Greg's out money." The implication was simply that it could be to Begay's advantage to express remorse and try to rectify Hallett's loss.

12

We see no indication that Jensen was trying to take advantage of Begay's distress. Jensen's tone and demeanor were not heavy-handed; his voice was calm save for a second when he said "Dylin, Dylin, Dylin" in a slightly louder voice to regain Begay's attention as Begay continued to deny the photographs were of him.

Begay relies on cases that are not comparable. In *People v. Neal, supra,* 31 Cal.4th 63 (*Neal*), the detective admitted deliberately violating *Miranda* by continuing to interrogate the defendant after he invoked his right to remain silent and, nine times, his right to counsel. (*Neal,* at pp. 68, 73-74, 81.) The detective told the defendant he would " 'make it as best as I can for you' " if the defendant cooperated but, if the defendant did not, "the system is going to stick it to you as hard as they can." (*Id.* at pp. 73, 81.) The defendant did not confess during this interview but did so the next day, after being kept in jail overnight without access to counsel, food, drink or toilet facilities. (*Id.* at p. 82.) *Neal* noted, "Both the promise and the threat had the effect plainly intended by" the detective. (*Id.* at p. 85.) Here, Jensen neither offered to treat Begay leniently if he cooperated nor suggested Begay would be treated harshly if he did not cooperate.

In *People v. Vasila* (1995) 38 Cal.App.4th 865, a sheriff's detective executing a search warrant for illegal guns at the defendant's farm found a quantity of marijuana and several legal firearms. (*Id.* at p. 868.) Interviewing the defendant in hopes of locating the illegal weapons, a federal officer told the defendant a state drug prosecution would likely result in probation and, if he revealed the location of the weapons, the officer would not pursue a federal prosecution; the sheriff said he would release the defendant on his own recognizance. (*Id.* at pp. 871-872.) *Vasila* explained that it was permissible for the officers to encourage the defendant to tell the

13

truth by communicating that it would be to his advantage to do so, but they exceeded permissible bounds by expressly and impliedly promising additional benefits—release and avoidance of federal prosecution—in exchange for the defendant revealing where the weapons were hidden.  (*Id.* at p. 874.)  Jensen made no such promise.

Begay became emotional when Jensen initiated the arrest, increasingly so as Jensen told him he was going to jail.  Begay's repeated statements of apology were clearly spontaneous expressions of his building emotion.  They reflect how upset he was, but they were not rendered involuntary by any threat or promise by Jensen.

### C. Begay Was Not Prejudiced by a *Miranda* Violation.

" ' "[B]efore being subjected to 'custodial interrogation,' a suspect 'must be warned he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " ' (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400.)" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*).)  "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda v. Arizona, supra,* 384 U.S. at p. 444.)  The test for *Miranda* custody is, ' "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.)  The objective circumstances of the interrogation are examined, not the ' "subjective views harbored by either the interrogating officers or the person being questioned." ' (*Ibid.*)" (*Kopatz,* at p. 80.)

Begay maintains that he was in custody for *Miranda* purposes from the moment Jensen began to show him the ATM photographs and accused him of the thefts.  He argues he did not feel free to leave because when he asked if

14

Jensen was there to arrest him, Jensen said, "I don't know yet" and asked Begay to implicate himself.[5]  The People concede Begay was in custody for *Miranda* purposes once Jensen initiated a formal arrest, but contend he was not in custody before that point.  The People further contend that even after the arrest, Jensen's statements were not the functional equivalent of interrogation.

"When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation.  [Citation.]  All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 395.)  " 'No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.' " (*People v. Saldana* (2018) 19 Cal.App.5th 432, 455.)

---

[5] Begay does not appear to have made this argument in the trial court; defense counsel's requests for exclusion were directed to the portion of the encounter following the formal arrest.  This may be because counsel was not asked for her arguments until after the court reviewed the recording and stated its conclusion that the exchange prior to the formal arrest was noncustodial.  In any event, even if we might view Begay as having forfeited the point if our review of the trial court's decision turned on its resolution of disputed facts (see *People v. Linton* (2013) 56 Cal.4th 1146, 1166), the purposes of the forfeiture doctrine would not be served here since we apply independent review to the recorded interview.  (*People v. Duff, supra,* 58 Cal.4th at p. 551.)

Begay maintains that most of the relevant factors support a conclusion that he was in custody from the point Jensen told him to come to the front of the patrol vehicle so he could show Begay some "stuff." Specifically, he identifies "[t]he critical moment determining [his] custody" as "when Deputy Jensen instructed him to stand in front of his patrol car, immediately accused him of a crime, and then equivocated when Begay asked if Deputy Jensen had come to arrest him." Begay argues that by asking whether Jensen was there to arrest him, Begay showed he suspected he was not free to leave, and no reasonable person would have felt free to terminate the interview because Jensen's response—saying he did not know yet and immediately confronting Begay with the ATM photographs—implied that Begay's answer would determine whether Jensen would arrest him.

We do not agree that Begay was in custody as soon as Jensen told him to come to the front of the police vehicle. Jensen's direction flowed naturally as Jensen and Begay reached the vehicles, Begay having walked with Jensen without compulsion as Jensen explained in a casual tone of voice that he was there about Hallett. Jensen immediately made it clear he was contacting Begay as a suspect, as he suggested Begay might want to be "upfront" with him about "mistakes that were made" and, as Begay denied involvement, told him he had "transactions of you removing a thousand dollars, eight hundred dollars." But the overall circumstances were not coercive: They were talking outside Begay's home, Jensen's tone and demeanor were not overbearing, Begay was not restrained in any way and, while another officer was on the scene, he was well in the background until Jensen initiated the arrest. On balance, the circumstances were not such that a reasonable person would have " 'experienced a restraint tantamount to an arrest' " (*People v. Saldana, supra,* 19 Cal.App.5th at p. 455) and " ' "felt he or she was not at liberty to

16

terminate the interrogation and leave." ' " (*Kopatz, supra,* 61 Cal.4th at p. 80.)

The situation changed when Jensen got the documents from his vehicle and said he was going to write a report and would include what Begay told him if Begay wanted to "admit [his] misgivings." Begay responded by asking if Jensen was there to arrest him; Jensen said, "I don't know yet," and immediately held out a photograph and said, "Who's that. That's you." As Begay insisted it was not and repeated that he had not taken the money, Jensen directed him back to the photographs and continued to ask, "Who's that? [¶] . . . [¶] . . . Dylin, Dylin, Dylin. Are you saying it's not you? When Begay said it was not him, Jensen arrested him.

The People concede the interview became custodial with the formal arrest. In our view, it became custodial slightly earlier, when Jensen confronted Begay with the photographs and rejected Begay's denials after saying he did not know yet whether he was going to arrest Begay. A reasonable person confronted as Begay was by an officer who was actively deciding whether to make an arrest would not have felt free to walk away. Although this additional period of time was short—only about 20 seconds—it was important because Begay's denial that he was the person in the ATM photographs provided strong incriminating evidence in light of his defense at trial. Jensen did not provide *Miranda* warnings, and Begay contends the officer violated his rights by continuing to badger him to admit the crime.

"A defendant who is in custody . . . must be given *Miranda* warnings before police officers may interrogate him. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 297 (*Innis*).) In *Innis,* the high court defined the term 'interrogation,' stating that 'the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional

17

equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' (*Innis,* 446 U.S. at pp. 300-302.)" (*Haley*, *supra,* 34 Cal.4th at p. 300.)

Although Jensen did not directly question Begay, we cannot agree with the trial court's view that Jensen's statements were "mere advisements." In *Haley,* the case the trial court saw as similar to this one, just after the defendant was arrested at his home, the detectives told him they knew he had committed a murder because his fingerprints had been found at the murder scene. (*Haley, supra,* 34 Cal.4th at p. 300.) After pausing for "a moment," the defendant said, " 'You're right, I did it.' " (*Id.* at p. 296 and fn. 4.) Rejecting the claim that the detective's statement constituted an interrogation, *Haley* explained, "The detective did not phrase this statement as a question, and this statement did not call for an incriminating response.

18

A brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response." (*Id.* at pp. 300, 302.)

The present case is similar in that Jensen informed Begay he had evidence against him and expressed his belief that Begay was guilty, here by showing Begay the photographs, rejecting Begay's denials and telling Begay he would include it in his report if Begay wanted to admit his "misgivings," apologize and "make amends." Here, however, when Jensen confronted Begay with the photographs and Begay said he was not the person in them, Jensen repeatedly insisted the photographs were of Begay and directly sought a response from Begay: "Who's that? That's you. [¶] . . . [¶] . . . Dylin that's [¶] . . . [¶] . . . Dylin, Dylin. [¶] . . . [¶] . . . Who's that? [¶] . . . [¶] . . . Dylin, Dylin, Dylin. Are you saying it's not you? [¶] . . . [¶] . . . That's, that's you. [¶] . . . [¶] . . . That is you. Dylin, that's you. I know you don't want it to be you. Y– but it's you." This was more than just informing Begay of the existence of evidence: Jensen was clearly pressing Begay to respond to the accusation that he was responsible for the theft from Hallett's account. Jensen should have known his approach was " 'reasonably likely to elicit an incriminating response' " and the fact that Begay ultimately incriminated himself cannot be seen as an " 'unforeseeable result[] of [Jensen's] words or actions.' " (*Haley, supra,* 34 Cal.4th at p. 300, quoting *Innis, supra,* 446 U.S. at pp. 301-302.) This was a violation of *Miranda* and the portion of the interview following Jensen showing Begay the photograph and saying, "Who's that. That's you," was inadmissible in the prosecution's case in chief.

Still, while a statement obtained in violation of *Miranda* may not be used by the prosecution in its case in chief, the statement may be admitted

19

for purposes of impeachment as long as it is voluntary under constitutional standards. (*Harris v. New York* (1971) 401 U.S. 222, 224; *People v. May* (1988) 44 Cal.3d 309, 315.) We have already determined that Begay's statement was voluntary. Accordingly, it would have been admissible for impeachment even if the trial court had concluded Begay's *Miranda* rights were violated. Begay testified that he made the withdrawals at issue but did so at Millerstrom's direction, without intent to steal from Hallett. This defense directly conflicted with Begay's statements in the interview: His testimony that he made the withdrawals indicated he lied when he told Jensen he was not the person in the ATM photographs, and his emotional apologies in the interview indicated he was lying when he testified he made the withdrawals at Millerstrom's direction and did not intend to steal the money. As the prosecutor made clear in closing argument, the value of the interview to the People's case was its impeachment of Begay's credibility. Since the statements would have been admissible for this purpose, the error in admitting them was harmless beyond a reasonable doubt. (See *People v. Wood* (2002) 103 Cal.App.4th 803, 805 [error in admitting testimony in violation of defendant's Fourth and Fifth Amendment rights harmless because testimony would have been admissible for impeachment].)

## II.

### *Evidentiary Rulings*

Begay challenges a number of evidentiary rulings that he claims separately and cumulatively prejudiced his case by excluding evidence impeaching Millerstrom and admitting evidence impeaching him. The only real issue at trial was Begay's intent: He admitted making the withdrawals but claimed Millerstrom directed him to do so and denied any intent to steal the money. Since Millerstrom denied telling Begay to withdraw the money,

Begay sees this case as largely a credibility contest between himself and Millerstrom. Moreover, Begay argues there is reason to believe the jury struggled over the question of intent because it asked a question about intent during deliberations,[6] and therefore any evidence bearing on his or Millerstrom's credibility was important. He contends the trial court erred in excluding evidence that Millerstrom lied to the police and bank employees and attempted to dissuade Begay from testifying at trial and compounded these errors by erroneously admitting evidence suggesting Begay had previously been in jail.

"We review the trial court's decision to admit or exclude evidence for abuse of discretion." (*People v. Dworak* (2021) 11 Cal.5th 881, 895.) A court's exercise of discretion " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

**A. Millerstrom's Statement to Jensen**

Begay contends the trial court erred in excluding evidence that when Millerstrom reported the thefts, she falsely told Jensen she had full control over Hallett's bank account. Begay argues this evidence would have

---

[6] The jury's note stated: "We are at a dead end. We are not all in agreeance [*sic*]. Are we able to get more clarification about element number 3 under theft. Do we need to have only an opinion or belief if Dylan [*sic*] intended to deprive owner of it or do we feel we need to have proof beyond a reasonable doubt based on evidence submitted by council [*sic*]? We need so [*sic*] assistance." The court responded, "Each and every element of the offense needs to be proven beyond a reasonable doubt based on the evidence submitted."

21

supported his defense because Millerstrom could blame Begay for the thefts, and deflect blame from herself, by claiming she had authority over the account. Further, evidence that Millerstrom lied to the police would undermine her credibility.

Begay describes his argument as challenging the trial court's exclusion of "a recording" of Millerstrom telling Jensen she had full control over Hallett's account when she did not. Begay does not identify any recording of Millerstrom's statements to Jensen; his record citations are to the recording of Millerstrom's call to Bank of America.[7] As we will discuss, since the purpose of the call was to obtain authority over Hallett's account, Begay sees it as evidence that Millerstrom lied when she told Jensen, prior to the call, that she already had full control over the account. But nothing said in this call provides evidence of any statement Millerstrom made to Jensen.[8] There was no affirmative evidence at trial that Millerstrom told Jensen she had full control over the account, on a call or otherwise; Millerstrom testified that she did not have control over the account when she first spoke with Jensen and did not remember telling him she did.

Although Begay does not make the point clear, his argument appears to be directed at the trial court's ruling sustaining the prosecutor's hearsay objection when defense counsel asked Jensen whether Millerstrom told him she had full control over Hallett's account. Jensen had testified at the

---

[7] So far as we are aware, the only recordings discussed at trial were of Begay's interview and arrest; Jensen's phone call with Hallett and Millerstrom's call to the bank.

[8] The People argue the trial court properly found "the recording of Millerstrom's phone call to Deputy Jensen" inadmissible, referring to the recording as the subject of supplemental motion in limine 18. Supplemental motion in limine 18 addressed the recording of Jensen's call to Hallett.

22

preliminary hearing that Millerstrom told him she had full control over the account. But he did not testify at trial and, when defense counsel asked him on cross examination whether Millerstrom told him her name was on Hallett's account, the court sustained a hearsay objection.

Begay argues Millerstrom's statement was admissible pursuant to section 1101, subdivision (b), which permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . other than his or her disposition to commit such an act." He maintains that Millerstrom's lie demonstrates her intent to conceal the fact that she did *not* have control over the account when the money was withdrawn, which would have given her a motive to have someone else—Begay—withdraw the money for her. Begay also argues Millerstrom's false claim of authority over the account would have influenced Jensen's investigation by eliminating Millerstrom as a suspect and therefore was admissible "for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863.)

Defense counsel did not offer these rationales when asked to respond to the prosecutor's hearsay objection. Rather, counsel responded, "[i]t goes to impeachment" and, when the court said "[i]mpeachment is not a hearsay exception," counsel stated, "[i]t's a prior inconsistent statement." Counsel did not argue the testimony was admissible under section 1101, subdivision (b) or for a nonhearsay purpose. Generally, " 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be

23

urged on appeal.' " (*People v. Seijas* (2005) 36 Cal.4th 291, 301; *People v. Homick* (2012) 55 Cal.4th 816, 858 [argument forfeited where "[t]his specific objection was not made at trial"].) " '[A] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Tully, supra,* 54 Cal.4th at p. 980.) These principles apply here. We cannot review an exercise of discretion the court was not called upon to make.

## B. Bank of America Call

### 1. *Additional Background*

One of Begay's in limine motions sought admission of the recorded phone call from Millerstrom to Bank of America in which she and a person who identified himself as Hallett requested information about how to add Millerstrom to Hallett's account.[9] The date of the call was not specified but Begay asserted it must have been after Millerstrom reported the theft because in the call Millerstrom referred to having talked to the sheriff. As earlier noted, Jensen testified at the preliminary hearing that when Millerstrom reported the theft on October 26, 2023, she told him she had access to the account and her name was on it. Millerstrom became a joint owner of the account on April 2, 2024; prior account statements showed her as "ITF."

Begay's motion in limine asserted that the person with Millerstrom on the call was not Hallett. Begay argued the call was relevant and admissible 1) for the nonhearsay purpose of showing Millerstrom lied to Jensen when

---

[9] The recording was obtained through a defense subpoena of bank records. The subpoena requested all recorded phone calls regarding Hallett's account, all documents authorizing Millerstrom to exercise joint access and control of the account and account statements between October 1, 2022, and December 1, 2023.

24

she told him she had control over the account and to the bank when she falsely represented that Hallett was with her on the call; 2) as impeachment evidence if Millerstrom denied or was unable to recall the call; 3) as evidence that the person on the call was not Hallett, through comparison with Hallett's voice and demeanor on the recording of Jensen's call to Hallett; and 4) as a business record. At the hearing, Begay argued that evidence of Millerstrom's untruthfulness was relevant to his anticipated defense that she asked him to make the withdrawals. Opposing the motion, the People argued the evidence did not establish an affirmative defense because it did not tie Millerstrom to the withdrawals and bank statements showed she was a joint account holder. The People also argued there was insufficient foundation establishing who was on the calls.

The court deferred ruling on whether the call could be played as evidence of Millerstrom's untruthfulness until after Millerstrom testified, noting that she could be questioned about her control of the account, when the call was made and who was with her. The court stated that if Millerstrom testified she could not recall the phone call, the recording would be inadmissible for impeachment unless the court found she was willfully evasive. With respect to the other grounds for Begay's motion, the court ruled the recording inadmissible to prove the male voice on it was not Hallett's because the court could not determine from listening to the recordings that the person on this call was not the person on Jensen's call to Hallett, and the court found insufficient foundation for admission of the recording as a business record.

During Millerstrom's cross examination, defense counsel asked her when she "added yourself" to the account and Millerstrom testified she "did that" three or four months before trial, then clarified that she did not add

25

herself, Hallett had to add her.  She acknowledged that she called the bank to ask about being added to Hallett's account but testified that she was told she and Hallett both had to sign documents and have them notarized, and they went into the bank to do this.  Asked whether she called the bank with Gibson and had him impersonate Hallett in order to add her to the account, Millerstrom responded that she did not recall doing so but, "I could have done that.  It sounds like something I would [¶] . . . [¶] . . . [I]t sounds like something that it's a possibility."  She testified that hearing a recording would not refresh her recollection, "[b]ecause if I don't remember it now, then I don't remember it then.  If the audio recording says I did it, then I did it.  But I don't recall."

At this point, in a sidebar discussion, the court denied defense counsel's request to impeach Millerstrom with the recorded call.  The court later stated for the record that the defense sought to offer the call as an inconsistent statement after Millerstrom repeatedly said she did not recall it.  The court explained that Millerstrom's asserted lack of recall would not make the recording admissible as an inconsistent statement unless the court found she was "being willfully recalcitrant, obstructing justice, not answering questions that [she] appear[ed] to be able to answer."  The court found that Millerstrom was "very clear that she had difficulty recalling certain factors but not all factors" and the court did not find her inability to recall "willful or recalcitrant in any way."  Accordingly, the court concluded the call was not an inconsistent statement that could be used for impeachment.

### 2. *Analysis*

Sections 1235 and 770 " 'provide for the admission against a hearsay challenge of a prior statement by a witness "if the statement is inconsistent with his testimony at the hearing and is offered in compliance with

26

Section 770." [Citation.] Under Evidence Code section 770, prior inconsistent statements are admissible only if: "(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action." ' (*People v. Sapp* [(2003)] 31 Cal.4th [240,] 296.)" (*Dykes, supra,* 46 Cal.4th at p. 758.)

"'Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. (*People v. Green* (1971) 3 Cal.3d 981, 988.) However, . . . [w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. (*Id.* at pp. 988-989.) As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 711.)

Here, the trial court found Millerstrom's lack of recall did *not* amount to deliberate evasion and, therefore, her testimony was not inconsistent with her prior statements. Begay does not argue the court's finding was erroneous. Rather, he argues the court's premise for excluding the recording was erroneous because, while Millerstrom did not deny having Gibson impersonate Hallett on a call to the bank and testified only that she did not remember doing so, she denied calling the bank "to have herself added to [Hallett's] account." In the colloquy Begay points to, after Millerstrom testified that she and Hallett went to the bank three or four months before trial to add her to the account, defense counsel asked, "At some point before that, did you call Bank of America and ask them to add you to the account?" Millerstrom responded, "Before the three months, no." In Begay's view,

27

Millerstrom's "direct denial of the call itself" was enough to allow impeachment with the recording.

Begay did not make this argument in the trial court. Pretrial, the trial court denied Begay's motion to admit the recording as an inconsistent statement in the event Millerstrom testified she could not recall any portion of the call. When the issue arose during trial and the court explained that the recording would not be admitted as an inconsistent statement because Millerstrom's failure to recollect was not willfully recalcitrant, defense counsel stated her objection that the recording was "relevant information for the jury to hear" and preventing the defense from confronting Millerstrom with her statements deprived Begay of his right to a fair trial. Counsel did not suggest the court's ruling was incorrect on the basis that Millerstrom directly denied the call itself. Begay cannot now claim the court failed to consider an argument he did not make at trial. (*Tully, supra,* 54 Cal.4th at p. 980.)

### C. Evidence of Millerstrom's Threats

#### 1. *Additional Background*

At the end of Begay's testimony on direct examination, defense counsel asked him whether anything significant had happened the day before. The prosecutor interposed a relevance objection and, after a sidebar discussion, the court sustained the objection under section 352. The court later explained for the record that in response to its request for an offer of proof, defense counsel stated Begay would testify that when he arrived home, he heard Millerstrom on the phone threatening to kill him and his cats, and that Millerstrom pulled out the power cord, depriving Begay of power in the shed. Defense counsel "indicated it goes to her bias, her animosity and clearly to impeach Ms. Millerstrom." The court found the evidence was not probative

28

as to the events for which Begay was on trial and would require an undue consumption of time and confuse the jury. In the court's view, the proffered testimony "just now appears to be accusations we're going to make back and forth."

### 2. *Analysis*

Begay argues the evidence was relevant to show Millerstrom's vindictiveness and motive to implicate him in the theft and would have enabled the jury to conclude she was trying to intimidate him in order to prevent him from testifying that she directed him to make the withdrawals. In his view, this evidence was critical to his theory of defense, had substantial probative value and, because it was "relatively simple testimony," would not have confused the jury or consumed undue time. The People argue Begay's speculation that the jury would infer Millerstrom was attempting to dissuade him from testifying is unpersuasive because the evidence did not link Millerstrom to the theft and therefore could not have raised a reasonable doubt as to Begay's guilt by suggesting Millerstrom committed the crime.

Once again, the argument Begay makes here does not appear to have been presented in the trial court. As related by the trial court, defense counsel sought to introduce Begay's testimony about Millerstrom making threats and denying him electricity for impeachment, to show Millerstrom's bias against and animosity toward Begay; the trial court did not mention any issue of witness intimidation. Begay's briefs on appeal focus almost entirely on the theory that Millerstrom was trying to prevent Begay from testifying to prevent him from implicating her in the theft. As we have said, Begay cannot challenge the trial court's rulings on grounds he did not urge below and give the trial court an opportunity to consider. (*Tully, supra,* 54 Cal.4th at p. 980.)

29

Nevertheless, because Begay's offer of proof was summarized by the trial court and not set forth on the record, we will take the path of caution and address his contention. Assuming the trial court considered the proposed testimony as evidence of Millerstrom's culpability for the offense and attempt to dissuade Begay from testifying, the court did not abuse its discretion in excluding this evidence under section 352.

Begay sees the proffered testimony as probative evidence of a "potentially culpable third party's animus and acts of intimidation." His citation of *Thomas v. Hubbard* (9th Cir. 2001) 273 F.3d 1164, 1177, indicates he sees the proposed evidence as tending to prove Millerstrom was responsible for the theft.[10] In *Thomas,* however, the tendency of the evidence to prove the third party's culpability was obvious: The defendant—who was incriminated in the offense solely by a witness who was himself tied to the crime by substantial physical and other evidence—was prevented from presenting evidence that the witness attempted to evade the police in the months after the offense. (*Id.* at pp. 1168-1169, 1177-1178.) Here, either speculation or considerable further evidence would be necessary to establish the probative value of the testimony Begay sought to present.

According to the offer of proof, Begay overheard Millerstrom on the phone threatening to kill him and his cats and Millerstrom pulled the power cord that provided power to the shed where Begay lived. While this evidence *could* support the inferences Begay draws from it, Millerstrom's threats and conduct would not tend to prove her culpability or intent to dissuade Begay from testifying if, for example, she was angry about what she believed Begay

---

[10] Begay cites *Thomas* for the proposition that " '[f]undamental standards of relevancy . . . require the admission of testimony which *tends to prove* that a person other than the defendant committed the crime.' " (*Thomas, supra,* 273 F.3d at p. 1177.)

had done to Hallett; she was frustrated with the trial process; or some incident had triggered anger due to any number of issues that might have arisen during the years Begay had lived on her property. Had Begay testified as he proposed, the court would have had to allow contextual evidence such as who Millerstrom was speaking to, whether the circumstances suggested she intended Begay to hear her, and whether any incident precipitated her disconnecting the power cord. This would have required, at a minimum, Millerstrom's testimony as well as Begay's, and it was not unreasonable for the court to find the risk of consuming undue time or confusing the jury outweighed the probative value of the evidence.

Begay challenges the People's argument that Begay failed to show a link between the threats and Millerstrom's culpability for the theft. Arguing that no such link was necessary, Begay points to *People v. Guerra* (2006) 37 Cal.4th 1067, which explained that because a witness's fear of testifying is relevant to the witness's credibility, witnesses' testimony that they feared retribution for testifying against the defendant was admissible despite the absence of evidence that the defendant personally threatened the witnesses or that their fear was " 'directly linked' to the defendant." (*Id.* at pp. 1141-1142.) In cases such as *Guerra,* the evidence of a witness's fear was offered for purposes such as explaining discrepancies in the witness's testimony and hesitancy in answering questions. (*Ibid.*; *People v. Burgener* (2003) 29 Cal.4th 833, 869 [evidence of threats used to explain difference between prior and current testimony]; *People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588 [evidence of threats to explain why witnesses who identified defendant in police statements were reluctant to testify at trial].)

Here, the People's discussion of the need for a link to culpability for the crime was in response to Begay's argument that the evidence of Millerstrom's

31

threats showed her intent to dissuade him from testifying against her and implicating her as the perpetrator of the theft. The cases the People rely on make the point that third-party culpability evidence may be excluded if it shows only a propensity consistent with commission of the crime and not a direct link to the charged crime. (*People v. Hall* (1986) 41 Cal.3d 826, 830-831, 833, 835 [third party linked to crime by evidence of "waffle-stomper prints" in victim's bedroom," injury indicating left-handed killer, and party's knowledge of "unique particulars" of murder; exclusion of evidence error but harmless]; *People v. Davis* (1995) 10 Cal.4th 463, 501 [proper to exclude evidence offered to show third party "more likely to have been the killer because he had a history of violence"]; *People v. Farmer* (1989) 47 Cal.3d 888, 921 [same], overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6].) As Begay rightly points out, he linked Millerstrom to the present offense by his testimony that she directed him to withdraw the money from Hallett's account. But for the purpose of showing third-party culpability, the threat evidence had to be linked to the offense in the sense of having a tendency to prove Millerstrom's culpability and thereby create a reasonable doubt as to Begay's guilt. (*Hall,* at p. 833 [to raise reasonable doubt about defendant's guilt, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime"].)

To the extent Begay is arguing the excluded evidence should have been admitted for its bearing on Millerstrom's credibility apart from suggesting her culpability and intent to prevent his testimony, he provides no explanation. His general statement that the evidence was "directly relevant to Millerstrom's vindictiveness toward Begay, and her motive to implicate him in stealing from Hallett" is followed only by discussion of Begay's defense and use of the evidence to support inferences of her culpability for the crime.

### D. Reference to Jail

Begay moved in limine to exclude prior bad acts without a hearing outside the presence of the jury, and specifically to exclude evidence of a 2019 drug arrest. The court granted the motion after the prosecutor stated the People did not intend to introduce any bad acts evidence. At trial, after Jensen testified that when he received the ATM photographs from Millerstrom, he located a picture of Begay and matched it with the ATM photos, the prosecutor asked, "So in terms of pulling up a picture of Mr. Begay, how exactly did you do that?" Jensen replied, "Through our jail system—." The court sustained defense counsel's objection. The prosecutor then showed Jensen a photograph and asked who it was of, Jensen responded, "Mr. Begay" and the prosecutor asked, "is that photograph something that you pulled from your Sheriff's system?" The court overruled defense counsel's objection. Jensen testified that the photograph looked like the one he compared with the ATM photos.

Begay contends the trial court erred in overruling the defense objection to the question whether the photograph Jensen was shown came from "your Sheriff's system." With exceptions not relevant here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) The purpose of this evidentiary rule " 'is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history.' " (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1176.) Begay argues that although he had no prior convictions, the jury was led to believe he had a criminal past by "repeated testimony that he had a mug shot."

The People did not and do not offer any justification for the references to the "jail system" and "Sheriff's system," but argue Begay was not prejudiced by the brief references. These references were indeed brief, and there were no other references to Begay having been arrested previously, either in testimony or in closing arguments. We recognize that evidence of prior offenses is inherently prejudicial. (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) While the jury was not told Begay had been convicted of any prior offense, we also recognize that the existence of his photograph in the sheriff's "system" communicated that he had been arrested at some point in the past, which created a risk of prejudice in the eyes of at least some jurors.

Nevertheless, we see no reasonable probability Begay would have obtained a more favorable outcome if the source of the photograph had not been identified. The jury instructions included a lengthy caution about implicit or unconscious bias and admonishment to be aware of and not allow bias to influence assessment of the evidence. The jurors were instructed to base their decisions "solely on the evidence presented, your evaluation of that evidence, your common sense and experience and these instructions," and specifically told, "[t]he fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial." This instruction was impliedly directed at Begay's arrest and prosecution in the present case, but it was not expressly so limited and, as worded, would apply as well to a prior arrest. We perceive little risk that jurors not otherwise convinced of Begay's guilt would have been swayed to that conclusion by the brief, indirect reference to a prior arrest.

34

## III.

### *Cumulative Error*

Begay contends he was prejudiced by the cumulative impact of what he sees as the court's erroneous exclusion of three relevant pieces of evidence impeaching Millerstrom while admitting improper evidence that Begay had been arrested in the past. As just discussed, the admission of Jensen's testimony that he found Begay's photograph in the sheriff's system was at most harmless error. We have rejected Begay's other claims of error either on the merits or as forfeited. Accordingly, there is no basis for his claim of cumulative error. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [no cumulative error where court "rejected nearly all of defendant's assignments of error" and found those that did occur were not prejudicial]; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 ["[t]here can be no cumulative error if the challenged rulings were not erroneous"].) "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*Ibid.*) We are confident he did. (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

                                        STEWART, P. J.


We concur.


RICHMAN, J.


DESAUTELS, J.


*People v. Begay* (A171869)